282 F.3d 268
 Victoria SMYTH, for herself and as next friend for her minor child, Angela SMYTH; Patricia Montgomery, for herself and as next friend for her minor child, Casey Montgomery, Plaintiffs-Appellees,
v.
Sonia RIVERO, in her official capacity as Commissioner, Virginia Department of Social Services, Defendant-Appellant.
 No. 00-2453.
 United States Court of Appeals, Fourth Circuit.
 Argued November 2, 2001.
 Decided February 21, 2002.
 
 COPYRIGHT MATERIAL OMITTED ARGUED: Maureen Riley Matsen, Office of the Attorney General, Richmond, Virginia, for Appellant. Edward M. Wayland, Charlottesville, Virginia, for Appellees.
 ON BRIEF: Randolph A. Beales, Attorney General of Virginia, William H. Hurd, Solicitor General, Siran S. Faulders, Senior Assistant Attorney General, E. Paige Selden, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellant.
 Steven L. Myers, Virginia Poverty Law Center, Inc., Richmond, Virginia, for Appellees.
 Before WILKINSON, Chief Judge, and WILLIAMS and MOTZ, Circuit Judges.
 Reversed by published opinion. Judge WILLIAMS wrote the opinion, in which Chief Judge WILKINSON and Judge DIANA GRIBBON MOTZ joined.
 OPINION
 WILLIAMS, Circuit Judge.
 
 
 1
 Appellant Sonia Rivero, Commissioner of the Virginia Department of Social Services, appeals from a district court's order awarding attorney's fees to Appellees Victoria Smyth, Patricia Montgomery, and their children, Angela Smyth and Casey Montgomery (collectively, Smyth and Montgomery) under 42 U.S.C.A. § 1988(b) (West Supp.2001), which authorizes an award of such fees to the prevailing party in an action to enforce the provisions of certain federal statutes. Because we conclude that the district court erroneously characterized Smyth and Montgomery as prevailing parties, we reverse.
 
 I.
 
 2
 Seven recipients of aid[1] under the Aid to Families with Dependent Children (AFDC) program, a welfare program funded by the federal government and administered by the states, brought the underlying action under 42 U.S.C.A. § 1983 (West Supp.2001) in the United States District Court for the Western District of Virginia, claiming that a new paternity identification policy for welfare applicants instituted by the Commissioner[2] violated the Social Security Act, 42 U.S.C.A. §§ 601 et seq. (West 1991 & Supp.2001), and related federal regulations, as well as the Supremacy and Equal Protection Clauses of the U.S. Constitution. The policy, appearing at section 201.10 of Virginia's AFDC[3] Manual, required that an applicant for welfare in Virginia either identify the father of any child for whom aid was requested or, if uncertain of the child's paternity, provide the first and last names of all individuals who might be the father. The plaintiffs asserted that they were unable to identify the fathers of their children[4] as required by the policy, that they had communicated that fact to Virginia welfare officials, and that their welfare benefits had been reduced or eliminated altogether as a result. They sought, inter alia: (1) certification of a class of all children and their mothers who had been or would be subjected to the loss of cash assistance or other benefits for failure to comply with this regulation; (2) temporary restraining orders prohibiting the Commissioner from refusing to provide benefits to Smyth and Montgomery; (3) a declaratory judgment that the application of the policy to them violated the Social Security Act, related federal regulations, and the Supremacy and Equal Protection Clauses; (4) preliminary and permanent injunctions prohibiting the application of the policy to them or members of the proposed class and requiring instead that the Commissioner give an applicant the opportunity to attest under penalty of perjury to her lack of any requested information concerning her child's father, and further prohibiting the reduction or denial of benefits to an applicant so attesting unless the Commissioner had substantial evidence the attestation was false; and (5) attorney's fees and costs under § 1988.
 
 
 3
 In June 1996, the district court denied the plaintiffs' motion for class certification but entered a preliminary injunction barring enforcement of the paternity identification policy against the plaintiffs. In granting the preliminary injunction, the district court found that the balancing of likely harms in considering the plaintiffs' motion for a preliminary injunction clearly favored the plaintiffs, that the denial of benefits for noncooperation because of a claimant's inability to identify the father of her children contradicted the plain language of then-applicable federal regulations, and that the plaintiffs were thus likely to succeed on the merits.[5] The preliminary injunction entered by the court prohibited the Commissioner from denying welfare benefits to the plaintiffs "based solely on their inability to provide [the Commissioner] with paternity information after they have attested to a lack of information." (J.A. at 62.) Three of the seven plaintiffs (Lynn Winchester and her two children) were granted leave to dismiss their claims and did so at that point.
 
 
 4
 On August 1, 1996, Smyth and Montgomery moved for summary judgment, asserting that the language of 45 C.F.R. § 232.12(b) (1995) could not be reconciled with the Commissioner's paternity identification policy, that the policy was therefore invalid under federal law, and that they were entitled to a declaration to that effect and an injunction permanently enjoining the Commissioner from denying welfare benefits to otherwise eligible applicants in the same situation.
 
 
 5
 Thereafter, the Commissioner obtained a waiver from the Department of Health and Human Services (HHS) authorizing the definition of noncooperation in paternity identification implemented by the policy.[6] The waiver was conditioned on Virginia's establishing criteria for finding cooperation in those instances where it determines that the applicant cannot reasonably be expected to know the identifying information related to the child's father. Smyth and Montgomery then filed, on April 1, 1997, a supplemental memorandum in support of their motion for summary judgment in which they reiterated the claim that the Commissioner's policy violated the Equal Protection Clause of the Fourteenth Amendment and also claimed that the policy had conflicted with federal regulations until the waiver was implemented by the Commissioner in February 1997.
 
 
 6
 In her response to Smyth and Montgomery's motion for summary judgment and supplemental memorandum, the Commissioner stated that she would not seek repayment of benefits paid to Smyth and Montgomery prior to February 1, 1997, the date prior to which Smyth and Montgomery assert the Commissioner's policy conflicted with federal regulations. On September 11, 1997, the day before the scheduled hearing on Smyth and Montgomery's summary judgment motion, the parties' counsel agreed during a telephone conversation that Smyth and Montgomery would consent to continue the date of the hearing pursuant to a motion by the Commissioner and that the Commissioner would not seek repayment of benefits paid to Smyth and Montgomery between February 1, 1997 and the new date of the hearing. An understanding of this agreement (the September 11 agreement or the agreement) is contained in letters exchanged by counsel shortly after their conversation. The district court granted the unopposed motion to continue the hearing.
 
 
 7
 As of August 1, 1998, the Commissioner modified the paternity identification policy so that it no longer applies with respect to children born before May 1996 (the date of the original policy modification), provided that the welfare recipient declares under oath that she does not know the identity of the father of her child. The August 1998 modification, in other words, made the 1996 identification policy modification prospectively applicable only. As to children born after May 1996, the policy challenged by Smyth and Montgomery remains unaltered. Because both children still involved in the litigation at the time of the 1998 modification (Angela Smyth and Casey Montgomery) were born before May 1996, the district court dismissed Smyth and Montgomery's claims as moot under the modified policy. The district court also found in its order of February 4, 2000 that the communications between the parties regarding continuance of the scheduled hearing on the Commissioner's summary judgment motion constituted an "agreement" that the Commissioner would not seek repayment of benefits paid to the plaintiffs between February 1, 1997 and the new date of that hearing. The district court based this finding in large part on counsel for the Commissioner's statements during a status conference held before the district court on April 15, 1999. During that conference, the court found, counsel for the Commissioner "was not troubled by the admission that the parties previously reached an agreement, but was concerned with the court ordering the parties not to seek such benefits." (J.A. at 327.) "Accordingly," the court wrote, "the dismissal order will declare that the defendant is unable to seek repayment of TANF benefits because of the binding agreement between the parties." (J.A. at 328.)
 
 
 8
 On March 6, 2000, the plaintiffs filed a motion for attorney's fees and costs, seeking a total of $195,074.54, which was granted in full by the district court on October 17, 2000. In its order granting the motion, the district court reiterated its finding that the parties had come to an "agreement" wherein the Commissioner waived her right to seek repayment of certain benefits from the plaintiffs in return for the plaintiffs' agreement not to contest continuance of the hearing on the Commissioner's motion for summary judgment. The district court then found that because the plaintiffs had received a "judgment against the defendant (the preliminary injunction)" and a "partial settlement, which materially altered the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefitted the plaintiff," (J.A. at 495-96), the plaintiffs had "prevailed" for purposes of § 1988(b), and were entitled to attorney's fees. The district court awarded Smyth and Montgomery attorney's fees in the amount of $195,074.54. The Commissioner timely noted this appeal from the order awarding fees.
 
 
 9
 While this case was pending on appeal, the Supreme Court granted certiorari in Buckhannon Board & Care Home v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). This Court granted the Commissioner's subsequent motion to hold this case in abeyance pending the Supreme Court's ruling. Buckhannon has now been decided and we have had the benefit of oral argument in this case.
 
 II.
 
 10
 The Commissioner argues that the district court erred in finding that Appellees were prevailing parties in the action below and awarding Smyth and Montgomery attorney's fees pursuant to 42 U.S.C.A. § 1988 (West Supp.2001). Ordinarily, we review an award of attorney's fees for abuse of discretion. See Pierce v. Underwood, 487 U.S. 552, 557-63, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); Reich v. Walter W. King Plumbing & Heating, Inc., 98 F.3d 147, 151 (4th Cir.1996); 42 U.S.C.A. § 1988 (stating that "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee") (emphasis added). The designation of a party as a prevailing party, however, is a legal determination which we review de novo. See Perry v. Bartlett, 231 F.3d 155, 163 (4th Cir.2000).[7]
 
 A.
 
 11
 Under the "American rule" ordinarily applicable in our legal system, there is "a general practice of not awarding fees to a prevailing party absent explicit statutory authority." Buckhannon Board & Care Home v. West Virginia Dep't of Health and Human Resources, 532 U.S. 598, 121 S.Ct. 1835, 1839, 149 L.Ed.2d 855 (2001). Congress has created such statutory authority in § 1988(b), which reads in pertinent part as follows:
 
 
 12
 In any action or proceeding to enforce a provision of section[] ... 1983 [among other provisions], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs....
 
 
 13
 42 U.S.C.A. § 1988(b). The term "prevailing party," as used in § 1988(b) and other fee-shifting provisions, is a "legal term of art," Buckhannon, 121 S.Ct. at 1839, and is "interpreted ... consistently" — that is, without distinctions based on the particular statutory context in which it appears. Id. at 1839 n. 4.
 
 
 14
 Smyth and Montgomery urge us to find that the district court properly characterized them as prevailing parties on either of two theories. Either the preliminary injunction they were awarded by the district court or the September 11 agreement, they argue, effected the "`material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." Id. at 1840 (quoting Texas State Teachers Assn. v. Garland Ind. Sch. Dist., 489 U.S. 782, 792-93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989)). The preliminary injunction entered by the district court is sufficient, they assert, to constitute an "enforceable judgment[] on the merits...." Id. They contend that the Commissioner's modification of the TANF policy after entry of that injunction is equivalent to a recognition of and compliance with the injunction's terms, and that the injunction was thus sufficiently equivalent to a judgment on the merits to be characterized as having effected a material alteration in their legal relationship to the Commissioner. Alternatively, Smyth and Montgomery argue, the district court's reference to the September 11 agreement in its order renders that agreement "judicially sanctioned," and permits an award of attorney's fees on that basis. Id. Specifically, they contend that the district court's finding that the parties entered into a "binding agreement" throws sufficient judicial weight behind the agreement's terms to meet the standard enunciated in Buckhannon and earlier cases.
 
 B.
 
 15
 Because we have not previously considered Buckhannon in the context presented here, we pause to review briefly the factual and procedural circumstances of that case. Buckhannon involved a challenge to the closing of care homes (facilities that provide "assisted living" to their residents) that had failed an inspection by the West Virginia State Fire Marshal because, under state law, some of the homes' residents were incapable of "self-preservation" (defined essentially as the ability to escape a dangerous situation under one's own power). Id. at 1838. Buckhannon Board and Care Home, Inc., proprietor of the homes, instituted an action seeking declaratory and injunctive relief on the ground that the self-preservation requirement violated federal law, specifically the Fair Housing Amendments Act of 1988, 42 U.S.C.A. §§ 3601 et seq. The West Virginia Department of Health and Human Resources "agreed to stay enforcement of the cease and desist orders pending resolution of the case...." Id. Before the case was resolved on the merits, West Virginia eliminated the self-preservation requirement, and the case was dismissed as moot. Id. Buckhannon moved for costs and attorney's fees, which were denied at the trial level and by this Circuit on appeal.
 
 
 16
 The Supreme Court affirmed, holding that the circumstances of the case could not support a finding that Buckhannon was a prevailing party for purposes of awarding attorney's fees. Id. at 1840. The Supreme Court specifically rejected the "catalyst theory," concluding that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change" to make that plaintiff a prevailing party. Id.
 
 
 17
 The Buckhannon Court considered the character of the judicial relief that a party must receive to satisfy the prevailing party standard, finding the catalyst theory problematic in part because "[e]ven under a limited form of the `catalyst theory,' a plaintiff could recover attorney's fees if it established that the `complaint had sufficient merit to withstand a motion to dismiss for lack of jurisdiction or failure to state a claim on which relief may be granted.'" Id. (quoting Brief for United States as Amicus Curiae). Such preliminary successes, the Court stated, are "not the type of legal merit that our prior decisions, based upon plain language and Congressional intent, have found necessary." Id. In support of this proposition, the Court pointed to its decision in Hewitt v. Helms, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), where it held that "an interlocutory ruling that reverses a dismissal for failure to state a claim `is not the stuff of which legal victories are made.'" Buckhannon, 121 S.Ct. at 1840 (citing Hewitt, 482 U.S. at 760, 107 S.Ct. 2672).
 
 C.
 
 18
 A preliminary injunction such as that granted to Smyth and Montgomery below is closely analogous, for these purposes, to the examples of judicial relief deemed insufficient in Buckhannon. While granting such an injunction does involve an inquiry into the merits of a party's claim, see Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co., 550 F.2d 189, 195 (4th Cir.1977) (enunciating the test for granting a preliminary injunction, which includes an examination of the likelihood the plaintiff will succeed on the merits), and is, like any court order, "enforceable," the merits inquiry in the preliminary injunction context is necessarily abbreviated. Our precedent establishes that a plaintiff may, depending on the circumstances, need only to establish that his case presents a "substantial question" to obtain preliminary injunctive relief. Safety-Kleen, Inc. (Pinewood) v. Wyche, 274 F.3d 846, 859 (4th Cir.2001) ("`If the harm balance tips decidedly in favor of the plaintiff, a pre-liminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation....' In other words, the plaintiff's case must at bottom present a `substantial question'") (quoting Rum Creek Coal Sales, Inc. v. Caperton, 926 F.2d 353, 359 (4th Cir.1991)); MicroStrategy, Inc. v. Motorola, Inc., 245 F.3d 335, 339 (4th Cir.2001) (same; noting also that "if the plight of the defendant [is] not substantially different from that of the plaintiffs, that is, if there is no imbalance of hardship in favor of the plaintiff, then the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success") (alteration in original) (internal quotation marks omitted).
 
 
 19
 At the most, a party seeking a preliminary injunction may have to demonstrate "a `strong showing of likelihood of success' or a `substantial likelihood of success' by `clear and convincing evidence' in order to obtain relief." MicroStrategy, 245 F.3d at 340. A district court's determination that such a showing has been made is best understood as a prediction of a probable, but necessarily uncertain, outcome. Cf. 11A Charles Alan Wright et al., Fed. Prac. & Proc.: Civil 2d § 2948.3 at 188 (West 1995) (stating that "[a]ll courts agree that plaintiff must present a prima facie case but need not show that he is certain to win"). The fact that a preliminary injunction is granted in a given circumstance, then, by no means represents a determination that the claim in question will or ought to succeed ultimately; that determination is to be made upon the "deliberate investigation" that follows the granting of the preliminary injunction.
 
 
 20
 Moreover, in granting a preliminary injunction a court is guided not only by its assessment of the likely success of the plaintiff's claims, but also by other considerations, notably a balancing of likely harms. Safety-Kleen, 274 F.3d at 859 (explaining that "`the likelihood of irreparable harm to the plaintiff' is the first factor that a court should consider ... [and the] next step is to balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant"; only then should the likelihood of success on the merits be considered) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir.1991)). But cf., e.g., United States v. Kayser-Roth Corp., 272 F.3d 89, 101 n. 14 (1st Cir.2001) (stating that the "[l]ikelihood of success is the touchstone of the preliminary injunction inquiry") (alteration in original) (internal quotation marks omitted). In weighing these factors, a court should bear in mind that the factors "must work in conjunction," Ciena Corp. v. Jarrard, 203 F.3d 312, 323 (4th Cir.2000), and a high likelihood of harm to the plaintiff may reduce the extent to which that plaintiff must demonstrate a likelihood of success on the merits. Id. (stating that "[i]f the `hardship balance tilts sharply and clearly in the plaintiff's favor, the required proof of likelihood of success is substantially reduced.'") (quoting Direx, 952 F.2d at 817); cf. Steakhouse, Inc. v. Raleigh, 166 F.3d 634, 637 (4th Cir.1999) (stating that "[t]he more the balance of harms leans away from the plaintiff, the stronger his showing on the merits must be"). A plaintiff's burden to show a likelihood of success on the merits, in other words, varies according to the harm the plaintiff would be likely to suffer absent an injunction. While this frame-work may be well suited to reconciling the practical, equitable, and legal concerns that face a court determining whether to grant a party interim relief, cf. Ciena, 203 F.3d at 323 (identifying the Blackwelder factors as leading to an "overall equitable determination"), it renders such relief an unhelpful guide to the legal determination of whether a party has prevailed.[8]
 
 
 21
 The proceedings below in this case present an example of the preliminary, incomplete nature of the merits examination and the inter-play between the "likely harms" and "likelihood of success" factors in the preliminary injunction inquiry. Applying the Blackwelder test, the district court found that the balancing of likely harms strongly favored Smyth and Montgomery because the loss of benefits would be a severe hardship for them. The district court's decision to enter an injunction reflected that finding, as well as an assessment of the likelihood of success of Smyth and Montgomery's claims. The interplay of these equitable and legal considerations and the less stringent assessment of the merits of claims that are part of the preliminary injunction context belie the assertion that the district court's decision to grant a preliminary injunction was an "enforceable judgment[ ] on the merits" or something akin to one for prevailing party purposes. Buckhannon, 121 S.Ct. at 1840. For the reasons given above, we hold that the preliminary injunction entered by the district court does not satisfy the prevailing party standard of § 1988(b).[9]
 
 D.
 
 22
 Smyth and Montgomery next argue that they may be considered prevailing parties under the Supreme Court's reasoning in Buckhannon regarding consent decrees by virtue of the September 11 agreement, which they assert was incorporated in the district court's order and thus stamped with judicial imprimatur. See id. (stating that "court-ordered consent decrees" may meet the prevailing party standard). The agreement, they argue, gave them some of the relief they sought in bringing this action and was approved by the district court, rendering it equivalent, or at least analogous, to a consent decree.
 
 
 23
 We note initially that neither of the Commissioner's two waivers of the right to seek recoupment of benefits paid to Smyth and Montgomery is easily construed as a settlement. The initial waiver, made in her response to Smyth and Montgomery's motion for summary judgment, was entirely unilateral and thus cannot be so construed. The Commissioner stated therein that she would not seek repayment of benefits paid to Smyth and Montgomery prior to February 1, 1997. No evidence suggests that this waiver was anything but a voluntary gesture by the Commissioner. Indeed, Smyth and Montgomery might nearly as credibly suggest that the Commissioner's voluntary change to the paternity identification policy represented a "settlement" of their claims, as the actions were equally unilateral. Buckhannon teaches that such a voluntary, unilateral act is not enough for the opposing party to be said to have prevailed. Buckhannon, 121 S.Ct. at 1840 ("[a] defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial imprimatur on the change").
 
 
 24
 Nor is the September 11 agreement, in which the Commissioner again waived the right to seek recoupment of benefits, easily construed as a settlement. The Commissioner, through counsel, agreed therein not to seek repayment of benefits paid to Smyth and Montgomery between February 1, 1997 and the rescheduled hearing date for the summary judgment motion; that is, she agreed to extend her previously executed unilateral waiver. This agreement was more in the nature of a procedural quid pro quo than a settlement of any of Smyth and Montgomery's claims. The Commissioner agreed merely to maintain the status quo (that is, payment of benefits to Smyth and Montgomery without the threat of subsequent action to recover those benefits) in return for an uncontested continuance of the hearing date.
 
 
 25
 Even if the September 11 agreement were properly characterized as a partial settlement, however, Smyth and Montgomery would have to contend with the Buckhannon Court's disapproval of private settlements as a basis for prevailing party status. Although the Supreme Court suggested in Maher v. Gagne, 448 U.S. 122, 129, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), that a party may prevail for purposes of § 1988 by virtue of a private settlement and has repeated that suggestion elsewhere, see, e.g., Farrar v. Hobby, 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (characterizing Maher as allowing attorney's fees award for private settlement); see also S-1 & S-2 ex rel. Parents P-1 & P-2 v. State Bd. of Ed. of North Carolina, 21 F.3d 49, 51 (4th Cir.1994) (stating that "an enforceable judgment, consent decree, or settlement giving some of the relief sought" is necessary for prevailing party status) (emphasis added), the Buckhannon Court has since clarified the law on this point. In Buckhannon, the Court stated that its prior "dicta" suggesting that private settlements could support prevailing party status had "ignore[d] that Maher only `held that fees may be assessed ... after a case has been settled by the entry of a consent decree.'" Buckhannon, 121 S.Ct. at 1840 n. 7 (quoting Evans v. Jeff D., 475 U.S. 717, 720, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986) (emphasis and second alteration in original)). The Court then distinguished private settlements from consent decrees on the basis of the court's role in the disposition of the case. "Private settlements," the Court noted, "do not entail the judicial approval and oversight involved in consent decrees." Id. The Court further noted that "federal jurisdiction to enforce a private contractual settlement will often be lacking unless the terms of the agreement are incorporated into the order of dismissal." Id.
 
 
 26
 Smyth and Montgomery do not argue that the district court's order dismissing this case as moot was a consent decree. They do argue, however, that the September 11 agreement "was judicially sanctioned and incorporated into the court's final judgment" (Br. of Appellants at 10) by virtue of that order — in other words, that the order was equivalent to a consent decree for the purposes of determining whether they were prevailing parties. In some instances, they argue, outcomes not expressly characterized as consent decrees will nevertheless entail the judicial approval and oversight involved in consent decrees. The resolution of this case, they contend, presents such a situation. For the reasons set out below, we conclude that the precondition to such a finding — that the terms of the agreement be made part of the district court's order — does not exist, and therefore we reject this argument without determining whether the district court's order would render them prevailing parties had the terms agreed to by the parties been made a part of it.
 
 
 27
 Before turning to the question of whether the September 11 agreement and the district court's order below were, in combination, equivalent to a consent decree, it is helpful briefly to examine the relevant differences between settlements and consent decrees generally, as we conclude that these differences must inform the Supreme Court's determination that a line should be drawn between them in the prevailing party context. A consent decree has elements of both judgment and contract, a dual character that "result[s] in different treatment for different purposes." Local No. 93, Int'l Assn. of Firefighters, AFL-CIO v. Cleveland, 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (describing the "hybrid nature" of consent decrees); United States v. ITT Continental Baking Co., 420 U.S. 223 n. 10, 237, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (stating that "[c]onsent decrees and orders have attributes both of contracts and of judicial decrees") (citing United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932)). Thus, a consent decree
 
 
 28
 embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.
 
 
 29
 Rufo v. Inmates of the Suffolk County Jail, 502 U.S. 367, 378, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992) (citing Ry. Emp. Dep't, AFL-CIO v. Wright, 364 U.S. 642, 650-51, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961)); see also Alexander v. Britt, 89 F.3d 194, 199 (4th Cir.1996).
 
 
 30
 The parties to a consent decree expect and achieve a continuing basis of jurisdiction to enforce the terms of the resolution of their case in the court entering the order. See, e.g., United States v. Miami, 664 F.2d 435, 439-40 (5th Cir. 1981) (en banc) (concurring opinion of Rubin, J., joined by Brown, Anderson, Randall, and Thomas A. Clark, JJ.) ("A consent decree, although founded on the agreement of the parties, is a judgment. It has the force of res judicata, protecting the parties from future litigation. As a judgment, it may be enforced by judicial sanctions, including citation for contempt if it is violated."). Because it is entered as an order of the court, the terms of a consent decree must also be examined by the court. As Judge Rubin noted in United States v. Miami,
 
 
 31
 Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence.
 
 
 32
 664 F.2d at 441 (Rubin, J., concurring). In other words, a court entering a consent decree must examine its terms to ensure they are fair and not unlawful.
 
 
 33
 By contrast, a private settlement, although it may resolve a dispute before a court, ordinarily does not receive the approval of the court. Cf., e.g., Caplan v. Fellheimer Eichen Braverman & Kaskey, 68 F.3d 828, 835 (3d Cir.1995) ("Our federal courts have neither the authority nor the resources to review and approve the settlement of every case brought in the federal court system. There are only certain designated types of suits, for instance consent decrees, class actions, share-holder derivative suits, and compromises of bankruptcy claims where settlement of the suit requires court approval."). Nor is a private settlement agreement enforceable by a district court as an order of the court unless the obligation to comply with its terms is "made part of the order of dismissal — either by separate provision (such as a provision `retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 381, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). If the obligation to comply with the terms of the agreement is not made part of an order of the court, jurisdiction to enforce the settlement agreement will not exist absent some independent basis of jurisdiction. Id.
 
 
 34
 These characteristic features of consent decrees and private settlements are significant in the prevailing party context. A consent decree, because it is entered as an order of the court, receives court approval and is subject to the oversight attendant to the court's authority to enforce its orders, characteristics not typical of settlement agreements. The Supreme Court's admonition that consent decrees may satisfy the prevailing party standard while private settlements ought not be so construed is thus consistent with the general purposes and effects of the two forms of resolution of disputes. Generally, the Supreme Court has stated, a determination of "legal merit" is necessary for an award of attorney's fees. Buckhannon, 121 S.Ct. at 1840, 1841 (stating that prior Supreme Court cases establish a "`merit' requirement"). A consent decree, because of its "hybrid nature," is a special case; although it is a privately negotiated form of relief and "does not always include an admission of liability by the defendant," id., it nevertheless involves judicial approval and oversight that may suffice to demonstrate the requisite "court-ordered chang[e][in] the legal relationship between [the plaintiff] and the defendant." Buckhannon, 121 S.Ct. at 1840 (alteration in original) (internal quotation marks omitted).[10]
 
 
 35
 Although the district court's order below did not describe its disposition of the case as a "consent decree" (or a "consent order" or "consent judgment"), that does not necessarily end the inquiry. We doubt that the Supreme Court's guidance in Buckhannon was intended to be interpreted so restrictively as to require that the words "consent decree" be used explicitly. Where a settlement agreement is embodied in a court order such that the obligation to comply with its terms is court-ordered, the court's approval and the attendant judicial over-sight (in the form of continuing jurisdiction to enforce the agreement) may be equally apparent. We will assume, then, that an order containing an agreement reached by the parties may be functionally a consent decree for purposes of the inquiry to which Buckhannon directs us, even if not entitled as such. See Buckhannon, 121 S.Ct. at 1840 (identifying the "judicial approval and oversight involved in consent decrees" as distinguishing them from private settlements).[11]
 
 
 36
 We turn, therefore, to the question of whether the terms of the September 11 agreement were in fact made an enforceable part of the district court's order, as those of a consent decree would be. The issue of when the obligation to comply with the terms of a settlement agreement has been made part of an order of the court was examined by the Supreme Court in Kokkonen. Addressing a question of the scope of ancillary jurisdiction, the Supreme Court held that neither of the traditional "heads" of ancillary jurisdiction — to permit disposition by a single court of factually interdependent claims, and to enable a court to manage its proceedings, vindicate its authority, and protect its decrees — could support an assertion of jurisdiction to enforce a settlement agreement entered into by the parties and resulting in dismissal of the case pursuant to a stipulation by the parties. Kokkonen, 511 U.S. at 379-81, 114 S.Ct. 1673. The second "head" of ancillary jurisdiction, the Court reasoned, could not support the assertion because a court's need to protect its orders does not entail the power to enforce an agreement that was not made part of a court order in the first place. Id. The situation would have been different, the Court noted, if the obligation to comply with the terms of the settlement had been made part of the order; in that case, a breach of the agreement would also be a breach of the order, and the court could properly exercise its power to enforce the order. Id. at 381, 114 S.Ct. 1673. We find Kokkonen's reasoning instructive here. A court's responsibility to ensure that its orders are fair and lawful stamps an agreement that is made part of an order with judicial imprimatur, and the continuing jurisdiction involved in the court's inherent power to protect and effectuate its decrees entails judicial oversight of the agreement. Where the obligation to comply with the terms of the agreement is not enforceable as an order of the court but only as a contractual obligation, neither judicial approval nor over-sight are ordinarily involved.[12]
 
 
 37
 The obligation to comply with a settlement's terms must be expressly made part of a court's order for jurisdiction to enforce the settlement after dismissal of the action to exist. See Kokkonen, 511 U.S. at 381, 114 S.Ct. 1673 ("The judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order."). Either incorporation of the terms of the agreement or a separate provision retaining jurisdiction over the agreement will suffice for this purpose. Id. Where a court merely recognizes the fact of the parties' agreement and dismisses the case because there is no longer a dispute before it, the terms of the agreement are not made part of the order and consequently will not serve as a basis of jurisdiction.
 
 
 38
 The rule that a court's order must embody a settlement agreement to serve as a basis of jurisdiction to enforce the agreement is "adhered [to] strictly...." In re Phar-Mor, Inc. Securities Litigation, 172 F.3d 270, 274 (3d Cir.1999). This rule is interpreted to require that the district court give a clear indication that it is incorporating the terms of the agreement into that order or retaining jurisdiction over the agreement. See, e.g., In re Bond, 254 F.3d 669, 675-76 & n. 4 (7th Cir.2001) (stating that Kokkonen appeared to require "express" incorporation or retention; holding that district court's acting as if it had retained jurisdiction did not satisfy even the more lenient standard established in Seventh Circuit before Kokkonen and therefore declining to resolve whether Kokkonen modified that standard); In re Phar-Mor, 172 F.3d at 274 (holding that district court's dismissal "pursuant to the terms of the settlement agreement" did not incorporate the terms of the settlement or retain jurisdiction); Scelsa v. City Univ. of N.Y., 76 F.3d 37, 41 (2d Cir.1996) (stating that district court has jurisdiction only if the dismissal order expressly reserved authority to enforce the agreement, or incorporated the agreement into the order; holding, where dismissal order stated that "action is dismissed with prejudice and without costs to any party, except as set forth in the Settlement Agreement," jurisdiction to enforce did not exist under Kokkonen); Miener v. Missouri Dep't of Mental Health, 62 F.3d 1126, 1127-28 (8th Cir.1995) (holding, where dismissal order at issue acknowledged that "[a]ll matters... have been settled and resolved" but did not mention the settlement agreement itself or its terms, that district court did not have jurisdiction to enforce the order); Hagestad v. Tragesser, 49 F.3d 1430, 1432-33 (9th Cir.1995) (holding that dismissal order stating "action has been settled" did not incorporate the settlement agreement); Lucille v. City of Chicago, 31 F.3d 546, 548-49 (7th Cir.1994) (determining that a judgment "entered in accordance with" a settlement agreement did not incorporate settlement); cf. Columbus-America Discovery Group v. Atlantic Mut. Ins. Co., 203 F.3d 291, 299 (4th Cir.), cert. denied, 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 201 (2000) (holding that an agreed-to provision stating that "[t]he Court retains jurisdiction to enforce the settlement of the parties and the prior Orders in this case" satisfied Kokkonen's requirement that a court either retain jurisdiction or incorporate the terms of the settlement agreement into its order); Bell v. Schexnayder, 36 F.3d 447, 448 (5th Cir.1994) (holding that the district court retained jurisdiction by including language in its dismissal order that gave the parties the right to reopen the judgment if a settlement was not consummated within sixty days).
 
 
 39
 We have no trouble concluding that the district court's order in this case does not meet the test enunciated in Kokkonen. The district court's mention of the September 11 agreement in its final order, although it states that the Commissioner is unable to seek repayment of TANF benefits because of the binding agreement between the parties, does not make the obligation to comply with the terms of that agreement part of the order. First, nothing in the court's order could be construed as a retention of jurisdiction to enforce the agreement. Moreover, no language in the court's order clearly compels compliance with the terms agreed to by the parties. The district court's order in this case consists of two parts. In the first part, the court made two findings — that the Commissioner had revised the policy at issue so that Smyth and Montgomery were no longer disqualified from receiving benefits, and that the Commissioner could not seek repayment of TANF benefits paid to the plaintiffs under the prior policy. The second of these findings was stated as follows: "The court further finds that the defendant may not seek repayment of TANF benefits paid to the plaintiffs under the policy." (J.A. at 321) (emphasis added). The court went on to note the agreement of the parties as the source of this obligation, stating that the obligation existed because, "[b]y agreement of the parties... the [Commissioner] extended th[e] waiver" of the right to seek repayment of benefits from Smyth and Montgomery. Id. The second part of the court's order comes under the heading "ADJUDGED AND ORDERED," and contains statements that the case is moot for prudential reasons and the court lacks jurisdiction, that the Commissioner's motion to dismiss the case is granted, and that the court reserves jurisdiction to decide the issue of attorney's fees. (J.A. at 322.)
 
 
 40
 Nothing in this order suggests that the terms of the parties' agreement are "incorporated" into the order by a clear indication that they must be complied with pursuant to the order itself, as opposed to the principles of contractual obligation. The court's findings are most properly read as noting and reciting the agreement in question as a component of its analysis of the mootness of the case after the Commissioner's modification of the policy, rather than incorporating the agreement's terms. Examination of the Memorandum Opinion accompanying the order supports this conclusion. The district court noted in its Memorandum Opinion that the Commissioner had expressed concern shortly before entry of the final order with the court's "ordering the [Commissioner] not to seek ... benefits." (J.A. at 327.) When "asked whether there was anything wrong with reciting" the fact of the agreement and its effect in the order, however, the Commissioner stated that there was not. Id. The court's finding in the order that the Commissioner may not seek repayment of TANF benefits is therefore properly interpreted as a "recit[ation]" of the agreement rather than an approval and incorporation the agreement's terms. Cf. Kokkonen, 511 U.S. at 381, 114 S.Ct. 1673 (noting that the agreement reached by the parties there was "recited, on the record, before the District Judge").[13]
 
 
 41
 The district court also stated in its Memorandum Opinion that "the defendant is unable to seek repayment of TANF benefits because of the binding agreement between the parties" (J.A. at 328). It is thus apparent that the district court itself, plainly best situated to define the intent of its order, believed that the obligation to comply with the terms of the agreement stemmed from the agreement rather than its order.
 
 
 42
 We conclude that the judicial approval and oversight identified by the Supreme Court as involved in consent decrees are lacking where, as here, a settlement agreement (if the September 11 agreement can be categorized as such) is neither incorporated explicitly in the terms of the district court's dismissal order nor the subject of a provision retaining jurisdiction. The September 11 agreement was not, in other words, made a part of a court order and accordingly cannot be equated with a consent decree. Smyth and Montgomery therefore cannot be said to have prevailed, and we need not inquire whether other aspects of this agreement might distinguish it from those consent decrees sufficient to support a finding that a party has prevailed. To hold that Smyth and Montgomery are entitled to attorney's fees in this situation would defeat the Supreme Court's admonition in Buckhannon that § 1988 does not "authorize[ ] federal courts to award attorney's fees to a plaintiff who, by simply filing a nonfrivolous but nonetheless potentially meritless lawsuit (it will never be determined), has reached the sought-after destination without obtaining any judicial relief." Buckhannon, 121 S.Ct. at 1841 (internal quotation marks omitted).
 
 III.
 
 43
 We conclude that the district court erred in characterizing Smyth and Montgomery as prevailing parties and granting them attorney's fees on that basis. The district court's order granting attorney's fees is accordingly reversed.
 
 
 44
 
 REVERSED.
 
 
 
 
 Notes:
 
 
 [1]
 The plaintiffs below, three single mothers and their four children, sought and received permission to file their complaint and proceed in the action under pseudonyms. (J.A. at 3.) The pseudonyms were as follows: Victoria Smyth, Angela Smyth, Patricia Montgomery, Casey Montgomery, Lynn Winchester, C. Winchester, and K. Winchester
 
 
 [2]
 Smyth and Montgomery named Clarence H. Carter, Rivero's predecessor as Commissioner of the Virginia Department of Social Services, as the defendant in their complaint. On appeal, Rivero has been substituted for Carter. We shall refer to both as "the Commissioner" and for clarity shall use the feminine pronoun throughout this opinion when referring to the Commissioner
 
 
 [3]
 During the litigation below, the federal AFDC program was replaced, pursuant to federal law, by the Temporary Assistance for Needy Families (TANF) program. Pub.L. 104-193, Title I, § 103(a)(1), Aug. 22, 1996, 110 Stat. 2112. The program will be referred to hereinafter as TANF
 
 
 [4]
 Smyth stated that she could not identify any of several men who might be the father of her child to Virginia DSS officials. Montgomery provided Virginia DSS officials with the names of two possible fathers, but both men were proven not to be the father of her child by subsequent blood tests. Montgomery could provide only the first name of one other man whom she asserted might be the father of her children, and thus he could not be identified
 
 
 [5]
 Specifically, the district court noted that a federal regulation in force at the time, 45 C.F.R. § 232.12(b) (1995), defined the cooperation in establishing paternity required by 42 U.S.C.A. § 602(a)(26)(B) (West 1991) to include providing information "known to, possessed by, or reasonably obtainable by the applicant or recipient" and "providing information, or attesting to the lack of information, under penalty of perjury." The court stated that it agreed with Smyth and Montgomery that this regulation "operate[d] to preclude states from disregarding an attestation to lack of information by [a TANF] recipient or applicant." (J.A. at 60.) Section 232.12 has since been repealed
 
 
 [6]
 The waiver the Commissioner received from HHS is not included in the record on appeal. Because the parties agree that it was issued and as to its scope, however, we will assume its existence for purposes of this opinion
 
 
 [7]
 Because our resolution of the prevailing party issue is dispositive, we do not reach the Commissioner's argument that the district court abused its discretion in determining the amount of the attorney's fees award
 
 
 [8]
 Our Circuit's current framework for the preliminary injunction inquiry, specifically the establishment of the "analytical order, hierarchy of importance, ... comparative weights," and the intertwining of consideration of the factors in our prior cases has been criticized as a departure (in form if not necessarily in practice) from Supreme Court precedentSafety-Kleen, Inc., 274 F.3d at 868-70 (Luttig, J., concurring). Whatever the merits of this argument, it does not alter our conclusion here. The preliminary injunction inquiry, because of the preliminary, incomplete examination of the merits involved and the incorporation (if not the predominance) of equitable factors, is ill-suited to guide the prevailing party determination regardless of how it is formulated.
 
 
 [9]
 Smyth and Montgomery contend that some preliminary injunctions are sufficiently based on the merits to serve as a basis for an award of attorney's fees to the recipient as a prevailing party. They would distinguish such injunctions from those such as the injunction entered inSmith v. Univ. of North Carolina, 632 F.2d 316 (4th Cir.1980), which they argue did not address the merits, but was entered "merely to maintain the status quo." Id. at 347. They contend the district court did examine the merits of their case and reached a result favorable to them, and their injunction is thus materially different from Smith's.
 Addressing a preliminary injunction entered in a Title VII action, this Court found in Smith that the grant of the injunction to the plaintiff did not render her a prevailing party for purposes of awarding attorney's fees. There had not been, we reasoned, "a final disposition in favor of the party claiming it had prevailed." Id. at 349. Smith did not, however, render preliminary injunctions categorically deficient for prevailing party purposes. Rather, Smith only held that the plaintiff is not a prevailing party where the plaintiff obtains a preliminary injunction but ultimately fails to achieve the desired result. See id. at 346 (noting that "on none of her claims has [the plaintiff] ultimately obtained what she sought"); id. at 352 (stating that "just because an injunction was issued properly does not signify that a defendant must incur the costs of its issuance when a court has eventually proclaimed him to be innocent of discriminatory conduct"); see also Disabled in Action v. Mayor & City Council of Baltimore, 685 F.2d 881, 885 (4th Cir. 1982) (stating that Smith "held only that a party was not entitled to attorney's fees in connection with her successful application for a preliminary injunction, since the trial court ultimately ruled for her adversary on the merits").
 The conclusion that Smith does not in all cases preclude prevailing party status on the basis of a preliminary injunction, however, is not support for the inverse of that conclusion — that a preliminary injunction is in some cases a proper basis for prevailing party status. Moreover, the Smith court did consider the characteristics of a preliminary injunction that we believe make such an injunction an improper basis for the conclusion that a party has prevailed. See Smith, 632 F.2d at 347 (noting that the preliminary injunction hearing involved, at the most, "a prognosis of probable or possible success" and that the balancing of likely harms had favored Smith at the preliminary injunction stage). Whatever its scope, then, Smith does not support Smyth and Montgomery's position, and it is consistent with our holding here.
 
 
 [10]
 We recognize that this Circuit has in the past upheld awards of attorney's fees based on private settlements not integrated into consent decrees or court ordersSee, e.g., Disabled in Action v. Mayor & City Council of Baltimore, 685 F.2d 881, 885-86 (4th Cir. 1982) (upholding determination that plaintiffs who settled and dismissed discrimination action were prevailing parties); Young v. Kenley, 641 F.2d 192, 195 (4th Cir.1981) (same). These decisions, however, even if they survived our rejection of the catalyst theory in S-1 & S-2 ex rel. Parents P-1 & P-2 v. State Bd. of Ed. of North Carolina, 21 F.3d 49 (4th Cir.1994) (en banc) (adopting dissenting opinion of Wilkinson, J., 6 F.3d 160, 168-72) (rejecting catalyzation of post-litigation changes in a defendant's conduct as a basis for prevailing party status), do not survive Buckhannon's rejection of private settlements as a basis for prevailing party status, Buckhannon, 121 S.Ct. at 1840. Buckhannon's reasoning indicates that without a "judicially sanctioned change in the legal relationship of the parties," a party has not prevailed. Id.
 
 
 [11]
 Although a district court's incorporation of an agreement's terms or retention of jurisdiction in its order may demonstrate the degree of approval and oversight identified by the Supreme Court inBuckhannon as accompanying consent decrees, approval and oversight of an agreement alone will not suffice to make a party a prevailing party. The party must likewise demonstrate that it has received some of the relief it sought in bringing the lawsuit in the first place. See, e.g., Maher v. Gagne, 448 U.S. 122, 126, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980) (upholding award of attorney's fees where consent decree increased level, for purposes of AFDC benefits calculation, of work-related expenses deductible from income and gave AFDC recipients right to prove that actual expenses exceeded standard deduction where plaintiff had claimed that state regulations denied her credit for work-related expenses in violation of federal law). An agreement that the plaintiff will join a motion to dismiss a lawsuit in return for the defendant's promise not to seek sanctions against the plaintiff, for instance, would not render the plaintiff a prevailing party even if incorporated into an enforceable court order. Because we find the "settlement" achieved by Smyth and Montgomery insufficient to support prevailing party status, we do not discuss the nature of the "relief" they achieved thereby.
 
 
 [12]
 Some courts have suggested or identified circumstances where a district court might "approve" a settlement without making an obligation to comply with its terms part of its order dismissing the caseSee, e.g., Kokkonen, 511 U.S. at 381, 114 S.Ct. 1673 ("judge's mere awareness and approval of the settlement agreement do not suffice to make them part of his order"); In re Phar-Mor Securities Litigation, 172 F.3d 270, 274-75 (3d Cir.1999) (holding that although district court approved terms of settlement, it did not incorporate the terms of the settlement or retain jurisdiction over it, and therefore there was no jurisdiction to enforce it); Miener, 62 F.3d at 1127 (same). Although no "approval" by the court of the agreement reached between the parties is apparent here, we note that even such approval by the court of a settlement agreement would not create, as these cases demonstrate, judicial "oversight" of that agreement resulting from continuing jurisdiction over it, one of several factors that set consent decrees apart from private settlements. Buckhannon, 121 S.Ct. at 1840 n. 7.
 
 
 [13]
 We note that if the district court had incorporated the obligation to comply with the September 11 agreement in its order, the colloquy described here would raise a serious question as to whether both parties consented to incorporation of that agreement into a court orderCf. Local No. 93, Int'l Assn. of Firefighters, AFL-CIO v. Cleveland, 478 U.S. 501, 522, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (citing United States v. Ward Baking Co., 376 U.S. 327, 84 S.Ct. 763, 11 L.Ed.2d 743 (1964), for the proposition that a court "cannot enter [a] consent decree to which one party has not consented"). We need not address this issue, however, because we conclude that this settlement agreement was not incorporated into the district court's order.