**Debra Lynn HENLEY,
et al., Plaintiffs,**

v.

**FMC CORPORATION, a Delaware
Corporation, Defendant.**

**No. CIV.A. 2:95–1098.**

United States District Court,
S.D. West Virginia,
Charleston Division.

June 25, 2002.

Richard Neely, Neely & Hunter, Charleston, WV, Henry Dart, Covington, LA, Jack W. Harang, Metairie, LA, for Plaintiffs.

Joseph S. Beeson, Robinson & Mcelwee, Charleston, WV, Lee Davis Thames, Butler, Snow, O'Mara, Stevens & Cannada, PLLC, Jackson, MS, for Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT

HADEN, Chief Judge.

Pending are (1) Plaintiffs' motions (a) for preliminary approval of settlement, and (b) for orders implementing the distribution process; and (2) Defendant's motion for enlargement of time in which to submit its memorandum supporting the motion for preliminary approval. The Court **GRANTS** the motions.

### I. FACTUAL BACKGROUND

On December 5, 1995 Defendant FMC Corporation's chloride unit ruptured at its Nitro, West Virginia plant and released a hazardous cloud. The rupture was caused in part by failures in FMC's monitoring devices and safety valves. Following the leak, hundreds of people alleged they had suffered injuries as a result of exposure to the cloud.

On December 11, 1995 named Plaintiff representative Debra Lynn Henley, along with forty fellow named class representatives, instituted this action against Defendant FMC Corporation. Plaintiffs, on behalf of an alleged class, asserted they were injured during a chemical leak. These named, representative Plaintiffs ultimately represented a class of approximately 400 people allegedly injured by the leak.

Plaintiffs moved to certify a class consisting of "all persons or other entities, who or which sustained damage as a result of the leak of toxic gas from the Nitro, West Virginia facility of [Defendant] on December 5, 1995." On January 22, 1997 the Court granted conditional certification pursuant to *Rules* 23(b)(3) and (c)(4)(A), *Federal Rules of Civil Procedure*.

On March 5, 1998 the Court entered a Case Management Order certifying six subclasses.[1] On March 13, 1998 the par-

---

1. The six subclasses consisted of: (1) "[a]ll persons who suffered anxiety and emotional distress as a result of the leak;" (2) "[a]ll persons who were 'sheltered in place' on December 5, 1995 as a result of the leak;" (3) "[a]ll persons or entities who or which suffered lost wages and/or lost profits as a result of the leak;" (4) "[a]ll persons or entities who or which suffered property damage, either real or personal, as a result of the leak;" (5)

ties agreed to a joint plan under which each side would select an equal number of named representatives to serve as trial plaintiffs. On September 18, 1998 the first trial began with these fourteen representatives. The case was to be tried in two phases. The first phase required the jury to decide the class-wide issues of negligence and strict liability, as well as compensatory damages for the Plaintiffs. The same jury would decide whether FMC's conduct warranted punitive damages, which would be awarded in a single lump sum and then allocated, after adjudication or settlement of the individual claims, to all class members successfully proving actual damages stemming from exposure to the cloud.

The second phase, "if necessary, would involve the disposition of individual claims of class members," under which "[r]esolution [could] occur either by a series of mini-trials or disposition by a special master or mediator." (Case Management Order of Sept. 4, 1998.) "If mini-trials [were to be used], the juries would be instructed as to the findings on common issues of the original jury." (*Id.*)

At trial, FMC offered the testimony of its expert, Dr. Tony Eggleston, to show the wind direction had carried the cloud across a largely uninhabited portion of the state. Eggleston based his opinion partially upon data gathered from a wind monitoring station run by the West Virginia Division of Environmental Protection (DEP).

After Eggleston was excused by the Court and left town, Plaintiffs offered Steve Drake as a rebuttal witness to undermine Eggleston's testimony. Drake was an employee of the DEP who was supervised by Charles Spann, who was then out of the country. Plaintiffs had not previously disclosed Drake as a witness to either the Court or to FMC, and he had not been the subject of discovery. Drake's testimony was offered to show the equipment upon which Eggleston relied was defective and therefore that Eggleston's expert opinion was flawed. His testimony critically undermined the basis of Eggleston's opinion and, therefore, fatally damaged FMC's defense.

The jury later returned a verdict for Plaintiffs, awarding compensatory damages in a total amount of $83,000 to ten of the fourteen trial Plaintiffs, in amounts ranging from $6,000 to $17,500. After FMC stipulated its net worth at $776.6 million, the jury awarded punitive damages in the amount of $38.8 million.

When Spann returned from his travels, he submitted two affidavits contradicting the testimony of Drake and affirming the accuracy of the DEP equipment. On January 6, 1999, FMC filed a Notice of Newly Discovered Evidence based upon Spann's affidavits. The Court granted FMC a new trial as a result. This ruling was affirmed on appeal.

At the second trial, FMC accepted responsibility for the leak. This public concession of fault perhaps contributed to a prompt verdict for FMC on the issue of proximate causation and absence of injuries. On appeal, the Fourth Circuit, after affirming the Court's ruling on the new trial issue and sustaining the judgment on the jury verdict from FMC, nevertheless concluded the verdict form did not resolve the claims of other class plaintiffs. Accordingly, the case was remanded to ad-

"[a]ll persons delayed inside their motor vehicles as a result of the leak;" and (6) "[a]ll persons who suffered physical injury as a result of the leak." The subclasses covering claims related solely to shelter-in-place or stuck-in-traffic inconveniences were dismissed prior to trial.

dress claims of remaining litigants. Not long following remand, the parties informed the Court they had reached a proposed settlement of all claims. In accordance with an Order following notice of the settlement, the parties submitted the settlement materials and their respective briefing in support. The materials have been spread on the record for public inspection.

## II. DISCUSSION

### A. *Applicable Standards*

*Rule* 23(e), *Federal Rules of Civil Procedure,* provides as follows:

**(e) Dismissal or Compromise.** A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

Fed.R.Civ.P. 23(e). As our Court of Appeals has observed, "The primary concern addressed by *Rule* 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube Secs. Litig.,* 927 F.2d 155, 158 (4th Cir.1991). As this Court has previously noted, "[A] district court should not blindly accept the terms of a proposed settlement[.]" *Bragg v. Robertson,* 83 F.Supp.2d 713, 717 (S.D.W.Va.2000) (citing *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975)).

Certain factors have been developed for consideration by the Court in making the *Rule* 23(e) determination. The seminal case guiding a settlement approval decision in this Circuit is *Flinn v. FMC Corp.,* 528 F.2d 1169 (4th Cir.1975). In *FMC,* the Court of Appeals stated:

In reviewing the record and evaluating the strength of the case, the trial court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement, and the experience of counsel who may have represented the plaintiffs in the negotiation. The fact that all discovery has been completed and the cause is ready for trial is important, since it ordinarily assures sufficient development of the facts to permit a reasonable judgment on the possible merits of the case. Collusion and bad faith on the part of those purporting to represent the class in the negotiations will, of course, impugn the settlement. While the opinion and recommendation of experienced counsel is not to be blindly followed by the trial court, such opinion should be given weight in evaluating the proposed settlement. The attitude of the members of the class, as expressed directly or by failure to object, after notice, to the settlement, is a proper consideration for the trial court, though "a settlement is not unfair or unreasonable simply because a large number of class members oppose it." And because the cash settlement "may only amount to a fraction of the potential recovery" will not per se render the settlement inadequate or unfair.

*Id.* at 1173–74; *see In re Jiffy Lube,* 927 F.2d at 159 n. 1.[2]

---

**2.** *In re Jiffy Lube,* based on other authority, examined the factors in greater depth, focusing on two separate sets of factors for fairness and adequacy:

The court determined that the settlement was reached as a result of good-faith bargaining at arm's length, without collusion, on the basis of (1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of securities class action litigation.

## B.  Application of the Factors

The Court anticipates making more extensive findings, as necessary, after notice, an opportunity to object, and the fairness hearing. The findings contained herein are made primarily to justify the giving of notice and the scheduling of a fairness hearing.

### 1.  The extent of discovery that has taken place and the stage of the proceedings

Both class and merits discovery have concluded. The action has also been the subject of two, multi-week jury trials. Little is left for guesswork, then, on the nature of claims and the asserted defenses. The Court, counsel, the parties, and, to some extent, the general public, are quite familiar with the case substantively and procedurally.

### 2.  Bad faith or collusion and circumstances surrounding the negotiation

There is no indication of bad faith or collusion. Both sides ·diligently pursued their respective positions since the inception of the case. Testament to the parties' previous intractable positions is the failure of a lengthy mediation conducted in Boston in advance of the *second* trial to attempt a resolve the case. Both parties felt so strongly about the merits of their claims or defenses they were willing to undergo anew a lengthy and expensive second appearance before a jury. Collusion is not

an issue. The settlement appears at this point to be the product of arms-length, and hard fought, negotiations. These negotiations are the culmination of six years of tenacious legal contest.

### 3.  The experience of counsel

Plaintiffs' counsel possess well beyond the necessary experience required to both prosecute and settle this case. Both Jack W. Harang and Henry T. Dart are experienced class action attorneys who have tried similar class actions in other states. Richard Neely is a former, long-time member of the Supreme Court of Appeals of West Virginia and one intimately familiar with West Virginia substantive law. This representational synergy is uncommon in the class action cases the Court has presided over in the past. The Court is satisfied counsel have competently and capably represented their clients throughout the negotiation process.

### 4.  Objections from class members

To date, the Court has received no objections from any class members. Accordingly, this factor is, at worst, neutral.

### 5.  The relative strength of the Plaintiffs' case on the merits

There is substantial ·uncertainty on this point, a consideration .not lost on Plaintiffs' experienced counsel in agreeing to the settlement. The first trial resulted in a very generous verdict running to the tens of millions of dollars. The· second

---

. . . .
The district court's assessment of the adequacy of the settlement was likewise based on factors enumerated in *[In re] Montgomery [County Real Estate Antitrust Litigation,* 83 F.R.D. 305 (D.Md.)]: (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated ·duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement.
*In re Jiffy Lube,* 927 F.2d at 159–60; *see also* 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* (3rd ed.1992 and supp. 2001).

trial, however, resulted in no recovery. This case, better than any other over which the Court has presided, demonstrates the uncertainties inherent in the civil litigation process and jury verdicts. The Court cannot but surmise, at this preliminary approval stage, that the certainty of an amicable resolution and a million dollar recovery is anything other than a satisfactory result.

### 6. The existence of any difficulties of proof or strong defenses the Plaintiffs are likely to encounter if the case goes to trial

There are many considerations for the Court on this factor. Those considerations include (1) FMC's well-supported position no class member was harmed by the release; (2) the complexity, expense, and duration of a third trial and appellate proceedings to follow; and (3) the uncertainty of the issues affecting liability, particularly individual causation. The Court is also aware of the fact that further protracted proceedings will diminish any future class recovery, assuming one occurs.

### 7. The anticipated duration and expense of additional litigation

Were the case to proceed to a third trial, it could not commence sooner than early winter. Following a two week trial, an appeal would likely ensue with a disposition expected no earlier than 10–12 months. If mini-trials become necessary on some issues, that, as well, will indefinitely prolong final recovery. These necessary delays likely would result in, at least, another three year delay in resolution and tender of compensation to the class. This delay, coupled with the nearly

six years that have elapsed since the leak, is practically untenable.

### 8. The solvency of the defendants and the likelihood of recovery on a litigated judgment

The Court has no doubt FMC would be able to satisfy any judgment entered against it. That consideration, however, is largely beside the point given the other factors weighing in favor of a negotiated resolution.

Based on the foregoing, the Court **GRANTS** the parties' motions and **ORDERS** as follows:

1. The Stipulation of Settlement and Memorandum of Understanding is **APPROVED** preliminarily pending the outcome of the fairness hearing;

2. The Report and Recommendation prepared by the accounting firm of Bourgeois Bennett, L.L.C., along with the allocation protocol, schedule of allocations, fees, and costs, is **APPROVED** preliminarily;

3. The proposed long and short form notices,[3] including the claimant objection process described therein, attached to Plaintiffs' motion for preliminary approval is **APPROVED** and such notices may be disseminated as follows, after affixation of the undersigned's signature to the master copies:

   a. The long form sent by first class mail no later than July 15, 2002 to the last known address of all class members who timely filed proofs of claim; (2) the short form by publication, starting no less than sixty days prior to the hearing, at a minimum, in the *Charleston Ga-*

---

**3.** Plaintiffs appear mistakenly to refer to the short form notice as exhibit B and the long form notice as exhibit A. (Order for Prelim. Approv. at 3.) It appears just the opposite is true. If the Court misapprehends the description, the parties should so advise prior to preparing the notice for the printer.

zette and the *Charleston Daily Mail* at least two times each, separated in time by a space of at least one week; (3) by immediately posting of a copy of the long form. at the Clerk's office in the Robert C.. Byrd United States Courthouse in Charleston and on the Court's public website, in co-operation with Automation Team personnel.

4. Plaintiffs' counsel shall disseminate with the long form notice a list of all claimants and their respective financial shares of the settlement proceeds;

5. The accounting firm of Bourgeois Bennett, L.L.C. is **APPOINTED** allocation and distribution administrator for the settlement proceeds;

6. Bank One, N.A., Baton Rouge, Louisiana is DESIGNATED as the depository/trustee to which funds will be transferred from the Clerk after FMC pays the settlement into Court, subject to the Stipulation and Memorandum and any other Orders of the Court;

7. The funds to be deposited into the interest-bearing Bank One account are to be designated as a qualified settlement fund pursuant to the Internal Revenue Code, 28 U.S.C. § 468B and the regulations thereunder from the earliest date permitted by law;

8. Any and all objections to any portion of the settlement and its implementation, including the allocation of individual amounts to claimants, shall be filed in writing with the Clerk no later than September 5, 2002. The reasons underlying the objection shall be stated with particularity;

9. Failure to follow the procedure outlined for making objections shall result in waiver and the objector shall be forever foreclosed from challenging any of the terms of the settlement or its allocation;

10. A fairness hearing is **SCHEDULED** for *Monday, September 30, 2002 at 1:00 p.m.* to consider final approval and any objections to the settlement.

The Court anticipates counsel will be prepared to address all issues at the fairness hearing, including any objections and what Plaintiffs' counsel terms to be the "second phase" of that hearing, namely consideration of the reasonableness, fairness and adequacy of the settlement vis-a-vis individual allocation amounts. Any objections to the allocation protocol, schedule of allocations, fees and costs, or any other issue related in any way to the settlement shall be raised and addressed at the fairness hearing. Objecting claimants will be given an opportunity to be heard at the fairness hearing.

Pursuant to *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 381–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994) and *Smyth ex rel. Smyth v. Rivero,* 282 F.3d 268, 283 (4th Cir.2002), the Court expressly declines to relinquish jurisdiction pending final judgment and completion of all settlement terms. To that end, the Court **INCORPORATES** herein the terms of the agreement and memorandum of understanding and **RETAINS** jurisdiction over the agreement to ensure its satisfactory execution of any and all terms, along with the allocation and distribution of all settlement funds and fees and costs. If either party objects to such continuing jurisdiction, it may do so in writing within ten (10) days. The absence of any such filing will be treated as an affirmative waiver of objections.

Finally, the Court notes some changes to the forms of notice, which are attached with corrections. These corrections, and any necessary additions to fill existing blanks, must be made prior to dissemination and publication. If the Court has overlooked any matter necessary to implementation or the distribution process, counsel shall give notice of such in writing no later than five (5) days after entry of this Memorandum Opinion.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to post a copy on the public website at www.wvsd.uscourts.gov.